People of the State of Illinois ex rel. City of Chicago, Appellee, v. Ludwig D. Schreiber, City Clerk, Appellant. Harry Wolfberg, Separate Appellant.

Gen. No. 42,267.

Heard in the second division of this court for the first district at the April term, 1942. Opinion filed April 6, 1944.

GOTTLIEB & SCHWARTZ, of Chicago, for appellant; CLAUDE A. ROTH and HARRY E. SMOOT, both of Chicago, of counsel.

WARREN H. ORR, GOLD & LIEBMAN and MORRIS H. SACHS, all of Chicago, for separate appellant.

BARNET HODES, Corporation Counsel, for appellee; JAMES A. VELDE and ALPHONSE CERZA, Assistant Corporation Counsel, of counsel.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

This a mandamus proceeding instituted on relation of the City of Chicago (hereinafter referred to as plaintiff) to compel Ludwig D. Schreiber, city clerk of Chicago (hereinafter referred to as defendant) to turn over to the city treasury all the compensation he has received and will receive for issuing fishing and hunting licenses. Plaintiff's motion to strike certain portions of defendant's answer as amended was sustained and defendant elected to abide by his answer. On June 27, 1941 judgment was entered by the trial court which directed defendant to pay $38,363.90 forthwith to the city treasurer of the City of Chicago, which amount he retained as compensation for issuing fishing and hunting licenses during 1939 and 1940, to pay forthwith to said city treasurer "all fees collected by said City Clerk under the Fish and Game Codes of Illinois since January 1, 1941," to also pay to the city treasurer all fees thereafter collected by him under said codes and that a writ of mandamus issue commanding defendant to comply with the foregoing directions. Defendant's appeal was originally perfected to the Supreme Court, which ordered it transferred to this court.

The matters alleged in plaintiff's complaint are substantially as follows: Ludwig D. Schreiber is the

city clerk of the City of Chicago. He was elected to said office on April 4, 1939 and assumed the duties thereof on April 12, 1939. His term of office "runs until April 5, 1943 and until his successor is elected and qualified."

Section 3 of part two of Article XII of the Cities and Villages Act (par. 172, ch. 24, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 21.261]), which section is part of a special act relating solely to the City of Chicago and covers the matter of the compensation of city officers, provides in part as follows:

"The compensation of all officers shall be by salary, as fixed in the annual appropriation bill, by the City Council, and the compensation of no officer shall be altered during the same fiscal year. No officer shall be allowed any fees, perquisites or emoluments or any reward or compensation aside from his salary, but all fees and earnings of his office or department shall be paid by him into the city treasury."

The Municipal Code of Chicago has fixed the annual salary of the city clerk at $8,000. Defendant received said salary for the years 1939 and 1940 and the same salary was appropriated for said office for the year 1941.

Section 1 of an act entitled "An Act in relation to funds or monies received by public officers or agents of public or municipal bodies, by virtue of their offices or positions" (par. 20, ch. 102, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 92.18]) provides in part as follows:

"It is hereby made the duty of all officers or agents of public or municipal bodies of this state, who receive any funds, monies, or other things of value, by virtue of their offices or positions, except treasurers, to keep an account of all such receipts, by entries on written or printed forms, to be provided for the purpose by the public bodies or municipalities by the authority of which their offices or positions are held,

. . .

"Each month's receipts shall be separately paid over or delivered to the treasurer not later than the middle of the next succeeding month."

Section 11 of Article III of the Fish Code of Illinois (par. 66, ch. 56, Ill. Rev. Stat. 1939) provides that it shall only be lawful to take fish protected by said act after first having obtained a license so to do. Said section also provides for the making of applications for licenses and fixes the amounts of the fees for such licenses. Section 15 (par. 70) of the Fish Code provides in part as follows:

"Any county, city, village, township or incorporated town clerk issuing licenses provided for in this Act may deduct the following as his or her fee for so doing: . . ." (Then follow the respective amounts of the deductions authorized to be made by said clerks.)

Section 13 of the Game Code of Illinois (par. 79, ch. 61, Ill. Rev. Stat. 1939), which makes it unlawful to take game protected by the act without first having procured hunting licenses, provides for the making of applications for such licenses and fixes the amount of fees therefor. The fourth paragraph of section 23 (par. 89) of the Game Code provides in part as follows:

"Any county, city, village, township or incorporated town clerk, issuing hunting licenses, or licenses to take fur-bearing animals, provided in this Act, may deduct the following as his or her fees for such licenses:

"Twenty-five cents (25¢) in the case of resident hunting licenses and resident licenses to take fur-bearing animals, and fifty cents (50¢) in the case of non-resident hunting licenses and non-resident licenses to take fur-bearing animals."

Immediately upon taking office defendant Schreiber undertook the issuance of licenses under the Fish Code of Illinois and the Game Code of Illinois and

he issued 72,991 fishing licenses in 1939 and 79,705 in 1940 and 44,539 hunting licenses in 1939 and 47,779 in 1940. The total number of fishing and hunting licenses issued by him in 1939 and 1940 was 245,014. In accordance with the provisions of the Fish and Game Codes defendant made the following deductions from the moneys collected by him for the aforesaid 245,014 licenses: $7,300 for fishing licenses in 1939, $7,970.65 for fishing licenses in 1940, $11,142 for hunting licenses in 1939 and $11,951.25 for hunting licenses in 1940. These amounts, aggregating $38,363.90, were retained by defendant. The city made a written demand on him to turn said $38,363.90 over to the city treasurer and the defendant refused to comply with such demand.

Plaintiff's complaint concluded with the prayer that a writ of mandamus issue to compel defendant to pay to the city treasurer "said sum of $38,363.90, together with any and all sums of money deducted and received or which may hereafter be deducted and received by him as city clerk for the issuance of fishing and hunting licenses pursuant to the provisions of the Fish Code of Illinois and the Game Code of Illinois."

Defendant's answer as amended alleged substantially that he was authorized under the provisions of the Fish and Game Codes of Illinois to retain as his own personal compensation the $38,363.90 deducted by him from the fees which he collected for issuing the 245,014 fishing and hunting licenses referred to in the complaint.

The answer further alleged that city clerks of the City of Chicago under the present Fish and Game Codes and their antecedent enactments have always retained as their own the fees set forth in such codes and enactments as their compensation for issuing fishing and hunting licenses thereunder and that they never turned them over to the city treasurer; that

no demand has ever been made upon any clerk of the City of Chicago to turn over such fees to the city treasurer prior to the demand made on defendant immediately preceding the bringing of this suit; that neither the city council of the City of Chicago nor the fiscal representatives of the city have ever made provision for receiving nor have they ever anticipated receiving the compensation retained by the city clerk and his predecessors in office under the Fish and Game Codes of Illinois; and that county, city, village, township and incorporated town clerks throughout the State of Illinois, both under the present Fish and Game Codes and their antecedent enactments, have retained as their own the fees set forth in those codes as compensation for issuing fishing and hunting licenses pursuant to the provisions thereof.

The answer then alleged that there has obtained a long standing administrative interpretation, joined in by the City of Chicago, its city council and its officials, that "the fees set forth in the Fish and Game Codes of Illinois (and their antecedent enactments) as the compensation of the City Clerk for the issuance of fishing and hunting licenses constitute the personal and absolute property of such City Clerk."

It was also alleged in defendant's answer that the City of Chicago never made any provision for the payment of the expenses which are necessarily incurred and involved in the issuance of fishing and hunting licenses; that defendant personally incurred and paid expenses in the sum of $13,931.12 in connection with the issuance of 117,530 fishing and hunting licenses in 1939 and 127,484 fishing and hunting licenses in 1940; that after paying such expenses, the actual net compensation received by him was $24,432.78; and that after deducting the compensation allowed him, he paid the balance of the fishing and hunting license fees collected by him to the Department of Conservation of the State of Illinois as required by the Fish and Game Codes.

It was further alleged that the City of Chicago was made a defendant in an action brought by a taxpayer in the circuit court of Cook county for an accounting by Ludwig D. Schreiber, the city clerk, as to the identical fees involved herein and that the answer of the city filed therein averred *inter alia* that "there is a serious legal question presented whether the money belongs to the City Clerk or to the City of Chicago; that a reading of the Fish and Game Codes, on their face, shows that the City Clerk shall deduct as his fees a portion of the license fees collected by him; that by custom for many years the respective City Clerks had been retaining said fees as their own personal funds"; and that "on January 16, 1941 Alderman Douglas of the City of Chicago introduced in the City Council a resolution reading as follows:

" 'WHEREAS, it now appears that the city clerk of Chicago receives in addition to his salary of $8,000 a year a further addition of fees from the sale of state fish and game licenses which for the years 1937, 1938, 1939 seem to have amounted to between $18,000 and $20,000 a year, and

" 'WHEREAS, while this practice is perfectly legal since the state law permits the city clerk to retain portions of these fees and while this practice has legally gone on for a considerable period of time beginning long before the present city clerk took office, yet it amounts to the clerk being paid twice for his services, and

" 'WHEREAS, the custom of public officials receiving fees has been almost universally frowned upon and replaced by the payment of salaries to officials in return for public bodies receiving the fees, now, therefore, be it

" 'RESOLVED, that while in all this there is no reflection upon the character of the city clerk, who has merely followed a long-established and legally authorized custom, nevertheless in view of the generous salary paid to him by the city, we suggest to and re-

quest of him in a friendly spirit that he turn over to the city treasury his net receipts from such fees for the year 1941 and succeeding years, and be it furthermore

" 'RESOLVED, that we memorialize the legislature of the State of Illinois to amend the fish and game acts so that the fees now retained by the city clerk of Chicago may go to the municipality itself.

Paul H. Douglas
Alderman, Fifth Ward.' "

The question presented for our determination is whether the moneys retained by the city clerk as authorized deductions from the fees collected by him for the issuance of hunting and fishing licenses under the State Fish and Game Codes belong to him personally or belong to the City of Chicago. This precise question has not heretofore been considered or decided by the Supreme Court or any branch of the Appellate Court of this State.

The language used in both codes that any of the designated clerks issuing the licenses provided for therein "may deduct" the specified amounts "as his or her fees" for so doing is simple, clear and unmistakable and definitely declares that it was the legislative intention that the authorized deductions made by said clerks from the fees paid them for issuing hunting and fishing licenses might be retained by them as their own.

It is stated in plaintiff's brief that "it is apparent that the legislature intended all city clerks to retain the fees as their own except where, as in the case of the City of Chicago, the right of the city clerk is restricted by a special charter provision applying only to the City of Chicago" and that "it is not contended by petitioner that city clerks outside of the City of Chicago are not entitled to the fees." Thus the city concedes that it was clearly intended under the provisions of the Fish and Game Codes that all the clerks enumerated

therein are entitled to retain as their own the authorized deductions from the fees collected by them for fishing and hunting licenses, including the city clerk of Chicago, unless the latter is prohibited from so doing by the special charter provision in question. It is therefore necessary that the compensation provisions of the Fish and Game Codes be considered and construed in connection with said charter provision (par. 172), which is as follows:

"The compensation of all officers shall be by salary, as fixed in the annual appropriation bill, by the City Council, and the compensation of no officer shall be altered during the same fiscal year. No officer shall be allowed any reward or compensation aside from his salary, but all fees and earnings of his office or department shall be paid by him into the city treasury. . . ."

The salary of the city clerk was fixed at $8,000 a year and he was paid that amount annually. There can be no question but that defendant was prohibited by the foregoing section of the city charter from receiving compensation of any nature in excess of his salary for performing municipal functions or for performing duties in furtherance of corporate purposes of the City of Chicago. The question then arises as to whether the language "fees and earnings of his office or department shall be paid by him into the city treasury," as used in said charter provision, was intended to mean that the compensation received by defendant as an agent of the State in the exercise of a State function in issuing fishing and hunting licenses under the Illinois Fish and Game Codes should belong to the city.

Plaintiff insists that when the compensation provisions of the Fish and Game Codes are considered in the light of paragraph 172 of the Cities and Villages Act (hereinafter for convenience referred to as section 172), they must be construed to mean that the compen-

sation provided under those codes is "a fee and earning of the office or department of the person issuing the license and does not belong to the individual but to the city." Defendant contends that said section 172 relates solely to the compensation, salary and fees of a municipal officer received by him in connection with the exercise of municipal functions, that it relates to the city clerk only in connection with the performance of the municipal duties prescribed for him by the Cities and Villages Act and the Municipal Code of Chicago and that it has no relation to a State function.

Defendant did not contract to give all of his time to the service of the City of Chicago in the sense that such money as he might earn from every source during his term of office must be accounted for to the city. His duties as city clerk are defined in section 10 (par. 93) of the Cities and Villages Act and in the Municipal Code of Chicago and "when these are performed he is not required to do more." *Polk County v. Parker,* 178 Iowa 936, 160 N. W. 320, L. R. A. 1917 B, 1176. We have carefully examined the duties of the city clerk as outlined in the Cities and Villages Act and in the Municipal Code of Chicago and not one of them pertains to a State function or relates to State licenses. Every duty prescribed therein relates only to a municipal function. Neither the Fish nor the Game Code imposes the duty on the clerks designated therein to issue hunting and fishing licenses. They provide only that applications therefor shall be made to such clerks and, while neither code requires the clerks to issue the licenses, they authorize them to do so as agents of the State and offer the inducement of compensation for their services in the event that they do issue them. Unless section 172 can be said to prohibit the retention of such compensation by the city clerk, there is no statutory inhibition against his receiving fees or compensation from the State for acting as its agent in performing a State function. We think that

the provision in section 172 that "all fees and earnings of his office or department shall be paid by him into the city treasury" could only have been intended to apply to such fees and earnings as the office of the city clerk receives for the exercise of municipal functions and for services rendered in the performance of corporate purposes.

The language used in the 1937 Fish and Game Codes in respect to the compensation of the persons issuing fishing and hunting licenses demonstrates that the legislature did not intend that the restrictive provisions of section 172, which has been in effect since 1907, should apply to such compensation. If the legislature had intended that the restriction that "all fees and earnings of his office or department shall be paid by him into the city treasury" should apply to the compensation received by the city clerk for issuing fishing and hunting licenses, it would not have expressly provided in said codes that the clerk might retain such compensation "as his or her fees." In our opinion, if the legislature had so intended, it would have used appropriate language to indicate that the fees were to be received by the city clerk in his official capacity or as a fee of his office, so that the restrictive provisions of section 172 might be applied. Section 172 is precisely the same now as it was when the fish and game laws were codified in 1923 and recodified in 1937. If the city's contention were sustained and the clear expression of the legislative intention in the Fish and Game Codes that the city clerk as an individual is entitled to retain the fees in question were to be disregarded, it would result in convicting the legislature of a manifest absurdity in declaring that an official shall be allowed to retain compensation which under another law of its own creation he is prohibited from retaining. (*Sacramento v. Pfund,* 165 Cal. 84, 130 Pac. 1041.)

The 1923 Fish and Game Codes, in specifying the duties of the issuing officer, designated him in at least five places as county, city or village clerk. Yet the ad-

ministrative construction given these codes not only in the City of Chicago but throughout the State of Illinois was that the compensation authorized for the issuance of fishing and hunting licenses belonged to the officer in his individual capacity. If the legislature did not approve of this construction, it would undoubtedly have provided in the 1937 Fish and Game Codes that the fees belonged to the office of the issuing officer rather than to such officer individually. However, not only was such a change not made in the 1937 codes, but the legislature substituted therein the word "person" for county, city or village clerk wherever these words appeared in the 1923 codes in describing the duties of the issuing officer, thereby manifesting a contrary intention. Although for more than 35 years the city clerk of Chicago has been authorized under the fish and game laws of this State to retain as his own the prescribed compensation for issuing fishing and hunting licenses, neither has the legislature expressed an intention during said period that such compensation should be turned over by him to the city treasury nor has the city until now questioned the right of the city clerk to retain same.

It was not contemplated under the Cities and Villages Act that the city clerk would issue licenses for other than municipal purposes. Since the city is empowered to appropriate only for corporate purposes and since the city clerk issues fishing and hunting licenses as an agent of the State, which is not a corporate purpose, it would seem to necessarily follow that the salary of $8,000 appropriated annually by the City Council for the city clerk does not cover the duties performed by him for the State in issuing hunting and fishing licenses. Therefore it would also seem to follow that the compensation provisions of the Fish and Game Codes are not in conflict with the provision of section 172 that "no officer shall be allowed any fees, perquisites or emoluments or any reward or compen-

sation aside from his salary." In our opinion *Groesbeck v. Fuller,* 216 Mich. 243, 184 N. W. 870, 21 A. L. R. 249, is directly in point on the question as to whether a public officer has the right to be paid additional compensation for the performance of duties other than those prescribed by law for his particular office. There the Governor of the State of Michigan instituted a proceeding in mandamus to compel the payment of salary allegedly due him for services as a member of the State Administrative Board. Constitutional provisions fixed the salary of the Governor of Michigan, as well as that of other officers of that State, and prohibited the legislature from increasing the salaries of such officers during their terms of office. The Michigan legislature enacted a statute setting up an administrative board similar to a budgetary committee and designated the Governor and certain other State officers as members thereof and fixed the salary for the services to be rendered by the members of such board. The question presented was whether the provision for compensation of the Governor for services rendered by him on the State Administrative Board contravened the constitutional provision against increasing the compensation of a State officer's salary during his term of office. In that case the court held that, if the duties provided by the statute for the members of the State Administrative Board had been duties normally incident to the office of Governor, no additional compensation could have been provided but that since the duties of a member of the State Administrative Board were not those generally performed by the Governor and were in effect extra duties, it was proper for the legislature to provide extra compensation therefor and that the Governor's duties as a member of the State Administrative Board were totally disconnected with his office as Governor. There the court said in regard to the designation of the officials to act on the board: "Their official titles were

used merely for the purpose of designating the individuals who should compose the board.''

Plaintiff asserts that defendant could not issue fishing and hunting licenses if he were not city clerk and that therefore the issuance of such licenses is ''in connection with his public office.'' Inasmuch as the work done by defendant for which the fees in dispute were paid was work done for the State, the city clerk must be regarded in respect to same as an agent or officer of the State and not of the city. (*Sheboygan v. Parker*, 3 Wall. 93; *City of Philadelphia v. Martin*, 125 Pa. 583.) Unless the compensation retained by defendant belonged to his office or department, it cannot be regarded as public moneys belonging to the city and therefore the act heretofore set forth requiring municipal officers to turn public moneys over to the city treasurer has no application.

As already stated, there is no decision by a court of review in this State bearing on the question under consideration. However, similar questions under varying circumstances have been considered and determined by courts of review of sister States:

In *Sacramento v. Pfund*, 165 Cal. 84, 130 Pac. 1041, a mandamus proceeding was instituted to compel the county clerk of Sacramento County to pay into the county treasury the fees collected by him as such clerk for services performed in issuing hunting licenses. Section 2 of the Game Code of California (p. 663, Cal. Stats. 1909) provided that for the issuance of such licenses ''any person'' other than a commissioner was allowed as his compensation 10 per cent of the amount of the license fees. There the court held (p. 1041) that ''the phrase 'any person' seems to have been used designedly, for otherwise 'any official' would have been the more appropriate language; . . . that the use of the words 'any person' in this connection seems clearly to indicate that the Legislature designed to differentiate in the matter of the issuance of these li-

censes between the county clerks in their official capacity and county clerks in their private capacity; . . . that the clear purpose of this differentiation was to give expression to the legislative intent that the county clerks, as individuals, should be entitled to retain this 10 per centum 'as compensation.' ''

In *City of Sacramento v. Simmons*, 66 Cal. App. 18, 225 Pac. 36 (1924), the city of Sacramento brought an action against its commissioner in charge of public health and safety, to recover moneys paid him for acting as local registrar of vital statistics. A California statute provided that the city health officer should act as local registrar and perform all the duties thereof in connection with the central bureau for the preservation of records of marriages, births and deaths and fixed the fees for such local registrars. The California Code of Civil Procedure provided that no officer of a city should receive any compensation for services rendered for the city except his lawful compensation as such officer and fixed each commissioner's salary at $3,600 a year in full compensation for all duties and services performed by him. The statute further provided that all moneys collected by any officer of the city should be paid into the city treasury without deduction therefrom of any claim for fees or commissions. There the court said at pp. 37 and 39:

''The action by the plaintiff is prosecuted upon the theory that the moneys collected by the defendant while acting as registrar of vital statistics were and are public moneys belonging to the city of Sacramento, and that as such the defendant was not entitled thereto. . . . On the part of the defendant it is insisted that the fees collected by the defendant from the county of Sacramento were and are not public moneys; that such moneys belonged to the defendant individually . . . .

''. . .

"Much of the argument in this case is centered around section 96 of the charter hereinbefore set forth. That section directs that all public moneys collected by any officer or employee of the city shall be paid into the city treasury, without any deduction on account of any claim for fees, commissions, or any other cause or pretense, etc. The question naturally occurs, What is meant by the term of public moneys collected by any officer or employee of the city? . . . It does not include fees for services performed in behalf of an agency outside of and distinct from any of the municipal functions of the city of Sacramento. The person designated by the enactment of the Legislature to perform the services of collecting vital statistics and transmitting the same to the state registrar is acting under the authority thereof, and is not in any wise accountable to the municipality of Sacramento for any failure whatever to perform such duties. . . .

"The act in question simply makes different officers in different localities local state registrars of vital statistics, and, to the extent that they are discharging such duties, they are acting as state officers. They are state officers performing state functions, and are under the exclusive jurisdiction of the state registrar of vital statistics. The compensation provided for this service is in no wise connected with any function exercised as a municipal officer. The charter provision, we think, has reference to the performance of duties incident to the municipal office in question, and does not extend to matters which are entirely separate and distinct therefrom. The power of the state to utilize different officers in different localities and make them state officers for this purpose and direct fees to be paid for such services by the respective counties is upheld in the case of *Boss v. Lewis,* 33 Cal. App. 792, 166 Pac. 843. . . . The fact that one person performs the functions of both officers does not change the situation in any particular or make the two one. . . . Being

of the opinion that there was nothing in the city charter during the period involved in these proceedings or in the general laws of the state which required the defendant to turn over to the city treasurer of the city of Sacramento compensation collected by him from the county of Sacramento through the agency of the state of California for discharging the duties of local registrar of vital statistics for the state of California, we conclude that the judgment of the trial court herein should be and the same is hereby reversed.''

In *Shepard v. City of Lawrence*, 141 Mass. 479, a former city clerk sued the city of Lawrence to recover statutory fees for the recordation of marriages and deaths and the city counterclaimed for dog license fees retained by plaintiff. While the plaintiff therein was the city clerk of said city he had a fixed salary under a resolution of the city council, which also contained the provision that he should ''account for all moneys received in his official capacity.'' In that case the court said at pp. 480, 481:

''The defendant has filed a declaration in set-off to recover the amount retained by the plaintiff from moneys paid for licenses for dogs. The statute requires that every dog shall be annually registered and licensed in the office of the clerk of the city or town where it is kept, and a fee paid therefor. The clerks of cities and towns are required to issue licenses, and receive the money therefor, and pay the same into the treasury of the county, 'retaining to their own use twenty cents for each license.' Pub. Sts. c. 102 sections 80–84. The plaintiff issued many licenses, and has not accounted to the defendant for his fees retained.

''The licenses were not granted by the city, and the license fees belonged to the county, and the plaintiff, in collecting and paying them over, acted for the county rather than for the defendant. The city clerk was designated, *eo nomine,* to perform certain public

duties created by the statute, which did not concern · the city, and which did not intrinsically or historically pertain to the office of city clerk. We think that the compensation provided for him by the statute for these services cannot be deemed money received in his official capacity, within the meaning of the resolution of the city council fixing his salary as city clerk. That it was not intended to include the fees in question is apparent from the conduct of the parties. The plaintiff was reelected for successive years, and the same language was used in all the successive resolutions fixing his salary, though he never accounted for these fees; and it was not until the close of seven successive years of service that any claim was made by the defendant that he should account for them.''

The only case cited and discussed by plaintiff pertaining to compensation sought to be retained by city or county officials for issuing State licenses is *Schuylkill County v. Wiest,* 257 Pa. 425. This case, decided in 1917, involved fees deducted as compensation by the county treasurer of Schuylkill county, Pennsylvania, for issuing hunting licenses. A statute of Pennsylvania authorized the county treasurer "to retain for services rendered the sum of ten cents from the amount paid by each licensee, which amount shall be full compensation for services rendered by him. . . .'' The constitution of Pennsylvania (Art. XIV, Sec. 5) required county officers paid by salary to pay "all fees which they may be authorized to receive" into the treasury. To carry into effect said constitutional provision the legislature of Pennsylvania passed an Act on March 31, 1876 (P. L. 13), which required county salaried officers to pay into the treasury all fees received by them from "any source whatever.'' With reference to State functions performed by county officers, section 9 of said act provided that such county officers make returns to the State treasury of all taxes and fees due the State and that all commissions on the collection of the same "shall be deemed and taken as

part of the regular fees of the officer collecting the same, and shall be accounted for accordingly.'' There the court held that the county treasurer was not entitled to personally retain the compensation allowed for issuing hunting licenses because of the constitutional prohibition and the restrictive statutory provision that the commissions for collecting State taxes and fees shall.be deemed ''part of the regular fees of the officer collecting the same, and shall be accounted for accordingly.''

.The *Wiest* case is readily distinguishable. from the instant case because of the Pennsylvania constitutional provision requiring salaried county officers to pay ''all fees which they may be authorized to receive'' into the treasury, because of the statutory provision that salaried county officers turn over to the treasury all fees ''from any source whatever'' and because of the further statutory provision that commissions for collecting State taxes and fees shall be deemed part of the regular fees of the officer collecting same and accounted for accordingly.

*Bachman's Appeal,* 274 Pa. 420, decided in 1922, involved compensation retained by a county treasurer for the issuance of hunting and fishing licenses. There the court said at pp. 424, 425:

''The proper enforcement of the constitutional provision and the Act of 1876 has been a matter of great difficulty. County .officers have insisted on many occasions upon the right .to retain the commissions received by them for their personal use ·. . . but the rule is now well established that the treasurer is to be limited in compensation to his salary, unless he has been expressly designated as agent for the Commonwealth in the collection of license fees, and is given, by statute, the compensation provided for, in his individual capacity.''

*York County v. Fry,* 290 Pa. 310, decided in 1927, also involved compensation retained by a county treasurer for the issuance of hunting and fishing and many

other State licenses. The Game Code of Pennsylvania (Act of May 10, 1921, P. L. 432) provided that county treasurers "shall be agents of the commonwealth for the collection of said license fees, and for services rendered in collecting and paying over the same the said agents shall be allowed to retain for their own use the sum of ten cents from the amount paid by each licensee." The following statute (sec. 6, Act of April 12, 1923, P. L. 62), enacted subsequent to the decision in the foregoing *Bachman's Appeal,* provided in part as follows: "The salaries fixed and provided by this act shall be in lieu of all or any moneys, fees, perquisites, mileage, expenses, and other allowances which are now or may hereafter be received by or allowed to such treasurer, except commissions due or payable to the county treasurer for acting as agent of the Commonwealth, which commissions shall be payable to the county treasurers as now authorized by law." The phrase in this statute "as now authorized by law" had reference to the law as enunciated in *Bachman's Appeal* that a county treasurer "is to be limited in compensation to his salary, unless he has been expressly designated as agent for the Commonwealth in the collection of license fees, and is given, by statute, the compensation provided for, in his individual capacity." In the *Fry* case the court held that because the county treasurer was expressly designated to act as the agent of the State in issuing hunting licenses, he was entitled to retain as his own the authorized compensation. As to the compensation which the county treasurer was seemingly authorized to receive for issuing fishing licenses the court said at p. 314:

"The fishing licenses here involved are under the Act of May 16, 1921, P. L. 559, section 8 of which provides: 'A county treasurer may collect for his own use for services rendered under this act the sum of ten cents, to be paid by the applicant for a license.' This language might seem to indicate that the treas-

urer was entitled to the specified fee; but he is not; for as the statute fails to expressly designate him as agent for the Commonwealth, the above quoted provision of the Constitution controls, regardless of the language of the statute.''

Thus it is seen that, notwithstanding the strict Pennsylvania constitutional and statutory inhibitions, noted in the *Wiest* case, against county treasurers receiving any remuneration for their services except their salaries, the Supreme Court of that State in *Bachman's Appeal* avoided the effect of such inhibitions by holding that, if county treasurers were expressly designated as agents of the State for the collection of State license fees and were authorized to retain the prescribed compensation in their individual capacities, then such compensation belonged to them personally. As heretofore shown, the law as held in *Bachman's Appeal* was thereafter incorporated in a Pennsylvania statute. Our attention has not been called to any other State which has adopted such a rule and we fail to perceive any sound reason for the distinction between expressly designated agents of a State and expressly authorized agents of a State.

Plaintiff cites *Mulcrevy v. San Francisco,* 231 U. S. 669, *People v. Witzeman,* 268 Ill. 508 and *State of Indiana ex rel. United States v. Killigrew,* 117 F. (2d) 863. These were so-called naturalization cases and there is a clear distinction between them and the case at bar. In those cases the court clerk who made claim to naturalization fees in their individual capacities necessarily received them in their official capacities. Naturalization is brought about by a court proceeding and the clerk acts as an officer of the court in such proceeding and not in his individual capacity. The clerk's function in naturalization proceedings cannot be separated from his relation to the court. No one else could be designated to perform his official function. It was of course properly held in the naturalization

cases that the fees claimed by such court clerks individually were received by them in their official capacities and not in their personal capacities.

From what has been heretofore said it would seem that under ordinary rules of construction there is no conflict between the provisions of the Fish and Game Codes allowing compensation to the city clerk personally for issuing fishing and hunting licenses as an agent of the State and section 172 of the city charter. If it were necessary for us to determine the question before us from the language and legal effect of the relevant statutes alone, we would be inclined to uphold defendant's interpretation of the statutes and to also hold that his interpretation thereof is supported by the weight of such authority as we have been able to find on the question. However, if it can be said that the proper construction to be given the compensation provisions of the Fish and Game Codes is in a degree doubtful or open to reasonable debate, in view of the restrictive provisions of section 172 of the city charter, then the uniform, long standing and practical construction given to the aforesaid compensation provisions of the Fish and Game Codes by the legislature and by the administrative officials of the City of Chicago should be accorded great weight. This is true especially because of the injurious consequences that would follow a different construction.

As already shown, city clerks of Chicago have always retained as their own the compensation allowed them by the State for issuing fishing and hunting licenses. Defendant personally incurred and paid expenses of $13,931.12 in connection with the issuance of 117,530 fishing and hunting licenses in 1939 and 127,484 fishing and hunting licenses in 1940, or approximately $7,000 for each of those years. The record discloses that defendant did not use the facilities of the office of the city clerk nor any of its employees or materials in connection with the issuance of fishing

and hunting licenses but that he hired his own help and paid his own expenses. Since defendant's salary was $8,000 a year and since his expenses in connection with the issuance of fishing and hunting licenses were approximately $7,000 a year, if he were compelled to turn over to the city treasury the total compensation of $38,363.90 received by him in 1939 and 1940 for issuing said licenses, his salary would in effect suffer a reduction from $8,000 to $1,000 for each of said years and we do not think that such a result was intended by the legislature or contemplated by the city council in fixing his salary.

If we were to interpret the compensation provisions of the Fish and Game Codes to mean that defendant must turn over to the city treasury the authorized compensation which he received for issuing fishing and hunting licenses, then all former city clerks since 1907, when section 172 of the city charter was enacted, will be liable for similar compensation retained by them. Such a result would work an extreme hardship upon some, if not all, of these city clerks. It is not unreasonable to suppose that some of them were in office for more than one term, that the moneys retained by them have been spent and that in some instances, at least, income taxes have been paid upon them, which because of the federal statute of limitations could not be recovered; nor is it unreasonable to suppose that some of these clerks could not now pay over to the city treasury the sums of money retained by them, or if they could, that it would take the accumulations of a lifetime to do so. We think that defendant was justified in believing that, if elected city clerk, in view of the long continued practical construction given to the compensation provisions of the Fish and Game Codes, he would be entitled to the fees allowed by such codes for issuing fishing and hunting licenses thereunder. There can be no question but that the interpretation of the Fish and Game Codes for which plaintiff contends

would work a tremendous hardship and injury both on defendant and his predecessors in the office of city clerk of Chicago.

In *Cook County v. Healy*, 222 Ill. 310, where the court was required to determine whether or not certain fees were properly retained by the then State's Attorney of Cook county, it was said at p. 317:

"It cannot be said, however, that the intent as to State's attorneys was expressed in the same clear and unambiguous form that it was with respect to other officers, and in view of the long continued practical construction given to the constitution by the legislature and the administrative officers of the State, and the injustice that would follow from a different construction at this time, we are led to sustain the judgment of the circuit court.

"If it could be said that the language of the constitution was clear and free from any doubt, a contrary legislative and administrative construction would have no weight. (*Jarrot v. Jarrot*, 2 Gilm. 1.) But where the words of a constitutional provision admit of doubt, the court may and ought to consider a contemporaneous and practical construction given by the legislature and those concerned in the administration of the law, and also any injurious consequences which would follow a different construction. Where a particular construction has been given to a provision and it has been continued for a long term of years and acquiesced in by the public at large, such construction is entitled to great weight and may be equal in force to a judicial construction. *Bruce v. Schuyler*, 4 Gilm. 221; *Bunn v. People*, 45 Ill. 397; *Nye v. Foreman*, 215 id. 285; 8 Cyc. 736; Cooley's Const. Lim. 67; 26 Am. & Eng. Ency. of Law, (2d ed.) 633."

In *Village of Broadview v. Toman*, 309 Ill. App. 485 (leave to appeal denied), the question was raised as to the right of the county collector of Cook county

to withhold .and retain from special assessments collected by him for the Village of Broadview statutory fees and charges aggregating 50 cents per item for each special assessment returned delinquent by him and on which he made no collection. In that case we said at pp. 500, 501, 502 and 503:

"If we assume, however, that the intent of the legislature 'is in a degree doubtful or open to reasonable debate,' we are then aided in our interpretation of the relevant statutes by the following well-established rule of law:

" 'It is the province and duty of the courts to determine the meaning and true construction of constitutions and statutes, but when the legislative department, in the enactment of laws, and the executive officers, charged with the duty of enforcing or applying constitutional provisions and statutes, have, by contemporaneous, long, uniform and practical construction of a constitutional or statutory provision, accepted and acted upon it as having a definite and particular meaning, the conclusion so reached and acted upon by the legislative department and by executive officers will, in view of the great injury and injustice which would result from a change in such construction and meaning, be accorded great weight by the judiciary when that department of the government is called upon to construe the law, and will, in general, control, whenever the question is in a degree doubtful or open to reasonable debate. (*Bruce v. Schuyler,* 4 Gilm. 221; *Comstock v. Cover,* 35 Ill. 470; *People v. Loewenthal,* 93 id. 191; *People v. Board of Supervisors,* 100 id. 495; *People v. Fidelity and Casualty Co.,* 153 id. 25; *Boehm, v. Hertz,* 182 id. 154; *People v. Knopf,* 171 id. 191; *Burke v. Snively,* 208 id. 328; 8 Cyc. 736, 737.) The facts disclosed by this record call, as we think, for the application of this doctrine of construction to the contention here arising for decision, and should control

the inquiry as to the true meaning of the constitutional provision under consideration.' (*Nye v. Foreman,* 215 Ill. 285, 288, 289.)

"...

"Defendants contend that 'the overwhelming custom of more than twenty-five years' standing, possibly fifty years—in continually abiding by special assessment settlements and deductions, indicates conclusively that the City of Chicago and all the Villages in Cook County construed this statute to give the Collector the undoubted right to deduct this 50¢ charge and that this custom and usage in behalf of the County Collector is a clear indication of what these taxing bodies understood to be the intention of the Legislature in this instance.' This court knows that the City of Chicago and the numerous villages in Cook County have had in the past many able lawyers to represent them, and the action of these municipalities in acquiescing in the custom of the County Collector in making like charges to the instant ones against said City and Villages over a period of at least twenty-five years must be given great weight in the determination of the meaning of the relevant statutes under consideration. The fact that the County Board has never made appropriations for charges like the instant ones must also be given weight. Interpreting the statutes in question in the light of the general custom and usage, we are satisfied that the County Collector was justified in withholding and retaining from the special assessments collected by him for plaintiff, Village of Broadview, the sum of fifty cents per item for each delinquent special assessment returned delinquent by him and on which he made no collection."

Since it must be assumed that the administrative officers of the city knew that the clerks designated in the Fish and Game Codes, including the city clerk of Chicago, retained as their own compensation the authorized deductions for issuing fishing and hunting li-

censes and since the City of Chicago and its administrative officers have acquiesced for more than 35 years in the practice and custom of the city clerks of the City of Chicago in so retaining said authorized deductions as their own, it is manifest that great injury would result from now placing a construction upon the compensation provisions of the Fish and Game Codes that such compensation belongs to the City of Chicago and not to the city clerk personally.

We are impelled to hold that the compensation which defendant is authorized to receive under the provisions of the Fish and Game Codes for issuing fishing and hunting licenses thereunder belongs to him personally and that any change in the compensation provisions of said codes is a matter for the consideration of the legislature and not of the courts.

Other grounds for reversal or modification of the judgment of the trial court have been urged and considered, but in the view we take of this case we deem it unnecessary to discuss them.

The only remaining questions are those presented by the separate appeal of one Harry Wolfberg. It appears that on February 17, 1941 Wolfberg, as a taxpayer, filed a complaint in equity in the circuit court against Ludwig D. Schreiber and the surety on his bond for an accounting by him as city clerk as to the identical fees involved in the instant case; that on March 17, 1941 the City of Chicago filed a motion in the Supreme Court for leave to file an original petition for mandamus to compel Schreiber to pay such fees into the city treasury; that said motion of the City of Chicago was denied without prejudice on April 2, 1941; that on April 10, 1941 the city instituted the instant mandamus proceeding in the superior court; that after the complaint had been filed by the city in the mandamus proceeding, Wolfberg filed an amended and supplemental complaint on April 23, 1941 in his suit for an accounting in the circuit court, whereby he

made the city an additional party defendant, and wherein the sole relief sought against the city was to enjoin it from prosecuting its superior court mandamus suit; that no order for such an injunction was entered; and that on June 25, 1941 Wolfberg filed a petition for leave to intervene in the superior court mandamus proceeding, in which petition he prayed that the instant case be dismissed "because of a prior equity suit pending in the circuit court," that this case be consolidated with his equity suit in the circuit court, that this case be transferred to the circuit court for consolidation with said equity suit and that in any event Schreiber be required to make a detailed accounting in the mandamus suit of the fees received by him for issuing fishing and hunting licenses and of the credits he claims for his expenses in connection therewith. Wolfberg's motion for leave to intervene was denied and his appeal herein is from the order denying said motion.

The theory of Wolfberg, separate party appellant, as stated in his brief, is that "where a proceeding in equity for accounting and money decree has been commenced, a subsequent suit in mandamus for the same or similar relief should not be entertained; that where a public officer has failed to account for, and has unlawfully withheld money belonging to the public, any proceeding against him for the recovery of that money should require him to account, particularly where he continues to hold office in, and is sued by, the city of which he continues to be an officer; that even in mandamus the judgment should be that the respondent first account and then pay over the money found due upon accounting."

The theory of the city is that "Wolfberg's motion to intervene was properly denied because it was not necessary for a correct disposal of the case. The motion to consolidate was properly denied because there was no other case pending in the same court with which

to consolidate it. The motion to transfer was properly denied because Wolfberg had no right to file the case in the circuit court and consequently the court never acquired jurisdiction over the subject matter. Furthermore, motions to transfer and to consolidate are addressed to the discretion of the trial court and the decision of the trial court will not be disturbed unless its discretion has been abused; in this case the trial court did not abuse its discretion in refusing Wolfberg's motions.''

It should be observed at the outset of our consideration of the separate appeal that, in view of our conclusion that the compensation retained by defendant for issuing fishing and hunting licenses belongs to him personally, any decree that might have been entered against Schreiber in Wolfberg's circuit court suit for an accounting would have been just as unavailing as the judgment entered against him in the mandamus proceeding brought by the city.

The amended and supplemental complaint filed by Wolfberg in his circuit court suit is attached as an exhibit to his petition for leave to intervene in the superior court mandamus proceeding. Said complaint is replete with unwarranted charges of collusion between the mayor and corporation counsel of the City of Chicago and defendant. It was alleged therein that no attempt had been made in behalf of the city to compel Schreiber to pay the fees in question into the city treasury because he was a personal and political friend of the mayor and the corporation counsel. The charges of collusion were made for the purpose of showing that any demand made upon the city to institute an appropriate action against Schreiber would have been ineffective and that therefore such a demand was unnecessary. It will be recalled that the resolution of Alderman Douglas, heretofore set forth, was introduced at a meeting of the city council on January 16, 1941. This resolution was referred to the

finance committee of the city council and on February 5, 1941 the chairman thereof requested an opinion from the corporation counsel concerning the fees mentioned in said resolution. On March 3, 1941 the corporation counsel rendered an exhaustive written opinion pursuant to the request of the chairman of said committee, in which he concluded that the fees involved herein, which were retained by Schreiber, belonged to the City of Chicago. So it appears that Wolfberg ''beat the barrier,'' as it were, in filing his taxpayer's suit on February 17, 1941, which was shortly after the Douglas resolution had been referred to the corporation counsel on February 5, 1941 for an opinion thereon and while such an opinion was in the course of preparation. As has been seen, the corporation counsel's opinion was delivered to the chairman of the finance committee of the city council on March 3, 1941. Surely the situation did not call for such unseemly haste on the part of the taxpayer or furnish a proper occasion for Wolfberg's intervention for the protection of himself and the taxpayers of Chicago generally. It also appears conclusively that the failure of not only the present administrative officials of Chicago but of its administrative officials for the past 35 years to demand of or to attempt to recover from its city clerks the compensation received by them for issuing fishing and hunting licenses was not due to neglect, collusion or connivance but rather to the belief of said administrative officials that the compensation in question belonged to the city clerks personally, because the Fish and Game Codes and their antecedent enactments expressly provided that it did. After the matter was called to the attention of the corporation counsel by the Douglas resolution and after the investigation by the corporation counsel disclosed the possibility of recovering for the city the fees retained by the city clerk, it must be conceded that the city proceeded diligently to recover such fees.

Did Wolfberg have any right to institute the accounting proceeding in the circuit court or to intervene in the instant case? The general rule is that a demand upon the proper public official to bring suit in the name and on behalf of the city is a condition precedent to the maintenance of a taxpayer's suit, unless it is shown that such demand would be useless. No demand was made by Wolfberg before he commenced his suit in the circuit court and neither did he make any proper showing that a demand, if made by him, would have been unavailing. The corporation counsel is the duly authorized attorney for the City of Chicago and the duty is imposed upon him to appear in behalf of the city in all of its legal matters. (Par. 176, ch. 24, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 21.265].) In *Wagner v. Wallingford,* 257 Ky. 477, which involved a suit by a taxpayer to recover money retained by the defendant therein in excess of his salary, the court said at p. 478: "Obviously, the primary right to recover the sums sued for in this action rests in the municipality. . . . Before a taxpayer may maintain an action to recover funds due a municipality, he must request the appropriate officers of the municipality to act. Until it is made to appear that the public officers charged with the duty to act have refused to do so, there is no occasion for intervention of a citizen and taxpayer for the protection of himself and others similarly situated." (To the same effect are *Reed v. Cunningham,* 126 Iowa 302; *Williams v. Stallard,* 185 Ky. 10; *Merrimon v. Southern Paving & Construction Co.,* 142 N. C. 539; *Dunn v. Long Beach Land & Water Co.,* 114 Cal. 605.) It would present an intolerable situation if, while both the finance committee of the city council and the corporation counsel were considering the possibility of the recovery by the city of the fees in question, any taxpayer, whether his purpose was laudable or otherwise, could file a suit involving the same fees before the corporation counsel

had concluded his investigation of the pertinent law on the subject, preparatory to rendering his opinion thereon as requested by the chairman of the finance committee of the city council, and then be permitted to invoke the doctrine of prior suit pending against the City of Chicago. The city was not made a defendant to the Wolfberg suit until after it had instituted its mandamus proceeding against Schreiber and under the circumstances shown here, the city had the right to conduct its own litigation.

As to Wolfberg's contention that the trial court erred in refusing to transfer the mandamus proceeding for consolidation with his circuit court suit for an accounting, we think it is sufficient to state that such transfer was not required by "considerations of justice or convenience." (Par. 37, sec. 1, ch. 146, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 106.16].)

There is no merit in Wolfberg's contention that Schreiber should have been compelled in the mandamus proceeding to make an accounting as to the compensation received by him in 1939 and 1940 for issuing fishing and hunting licenses. An audit made by the city comptroller of Schreiber's records relating to such licenses revealed that the compensation received by him in 1939 and 1940 for issuing same was $38,363.90. This is the amount the city sought to recover for 1939 and 1940 and, while Wolfberg makes no claim that it is incorrect, he persists in his contention that Schreiber should be compelled to make an accounting in any event. No accounting as to the amount of compensation retained by the city clerk was necessary in any proceeding. The records of the State Department of Conservation show the number of fishing and hunting licenses issued by the city clerk each year. The Fish and Game Codes specify the compensation the city clerk is authorized to retain out of the fee paid for each fishing and hunting license issued by him. To determine the total compensation retained

by the city clerk in any year does not require any complicated accounting. Such compensation may be readily ascertained by the use of simple addition and multiplication.

In our opinion the trial court properly denied Wolfberg's petition for leave to intervene in the instant mandamus proceeding.

For the reasons stated herein the judgment entered by the superior court against the defendant, Ludwig D. Schreiber, is reversed and the order of said court denying leave to Harry Wolfberg, plaintiff in the circuit court suit, to intervene in the superior court mandamus proceeding is affirmed.

*Judgment reversed, order affirmed.*

FRIEND, P. J., and SCANLAN, J., concur.